UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ARTHUR F. FEENEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-1302 |
| | ) | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA | ) ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Plaintiff Arthur F. Feeney's ("Plaintiff") Motion for Summary Judgment (ECF No. 19) and Defendant UNUM Life Insurance Company of America's ("Defendant") Motion for Judgment on the Pleadings (ECF No. 20). For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Judgment on the Pleadings is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132(e)(1) and 1132(f) ("ERISA").

## BACKGROUND

I. Facts

Plaintiff was a former information technology accounts manager for Qlik Tech, Inc.[1] Plaintiff worked from home while he consulted on information technology and occasionally traveled to meet with clients. On June 22, 2014, Plaintiff was injured when a two-level scaffold tipped over and fell while he was repairing a light fixture at his home. Following the incident,

---

[1] The information in this section has been derived from the parties' undisputed material facts sections, as well as the administrative record. (ECF No. 11, ECF No. 19 at 2-10, ECF No. 21 at 3-36).

1

Plaintiff went to the emergency room at UPH Peoria Methodist and was discharged the same day with a concussion, back pain, and knee pain.

Plaintiff was fifty-two years old at the time of his injury and claimed to be disabled due to both physical and cognitive injuries from the fall. Therefore, he applied for long-term disability benefits under an employee welfare benefit plan sponsored by his employer. The plan was insured by Defendant and governed by ERISA.

On July 2, 2014, Plaintiff had his initial visit with a family medicine practitioner, Dr. Jill Wirth. Following the visit, Dr. Wirth provided a statement to Defendant where she diagnosed Plaintiff with a concussion and knee pain. Her treatment plan included instructions to Plaintiff for physical and cognitive rest until his headaches and dizziness resolved, with a gradual return to mental and physical activity. Dr. Wirth's restrictions included no activities that would cause increased heart rate or cognitive stress. On July 22, 2014, Dr. Wirth referred Plaintiff to physical therapy, for a neurology consult, and for a brain MRI, because he was still complaining of confusion, decreased concentration, and back and knee pain.

On July 30, 2014, Plaintiff had a visit with a neurologist, Dr. Howard Liu. Dr. Liu noted that the CT scan taken of Plaintiff's head at the hospital was unremarkable and assessed him with a concussion, sleep disorder, headache, vertigo, and memory loss. On August 26, 2014, Plaintiff underwent a brain MRI and the results included "[n]o acute posttraumatic abnormality identified. Mild supratentonal white matter disease is nonspecific, but most likely represents early chronic small vessel ischemic type change." (ECF No. 11-5 at 81).

On September 12, 2014, Plaintiff underwent an MRI of his left knee. The impression from the scan included "focal chondromalacia in the medial facet of the patella with underlying marrow

edema; no evidence of meniscal or collateral ligament tear; and small joint effusion." (ECF No.11-17 at 71).

Plaintiff attended twenty sessions of physical therapy between July 25, 2014, and October 29, 2014. His discharge report concluded that Plaintiff "made good progress over the course of treatment." (ECF No. 11-8 at 60). In July 2014, Plaintiff's initial assessment stated that he was unable to walk without symptoms, unable to sit or stand for fifteen minutes, unable to transfer from sitting to standing without assistance, unable to lift five pounds, and had reduced lumbar range of motion. *Id.* at 58-60. By October 2014, Plaintiff's discharge report stated that he had no pain at rest, sitting was not limited by symptoms, he could stand up to sixty minutes at a time, had no difficulty transferring from sitting to standing, was able to walk 501 to 1001 yards without symptoms, able to lift in excess of twenty-five pounds with no difficulty, had normal range of motion in his lumber spine with no impairment, had full 5/5 strength in his knees, ankles, and hip flexion and abductors, with only mild weakness in his hip extensors at 4/5, but was still reporting pain between 6-9/10. *Id.*

On December 15, 2014, Defendant consulted with Kelly Ghidoni, R.N., to evaluate Plaintiff's medical records. She concluded that as of October 29, 2014, Plaintiff had the functional capacity to perform the physical requirements of his employment and recommended further consultation with a physician regarding his capacity after that date. Defendant also consulted with Dr. Andrea Brown, who is board certified in family medicine. Dr. Brown prepared a report on December 26, 2014, that concluded Plaintiff's functional limitations were not supported past October 29, 2014. Specifically, she observed:

> The currently available file information does not support that, beyond PT discharge 10/29/14, claimant would be precluded from performing the physical demands of his occupation, which according to VRC Nancy Munroe 9/26/14 include occasional exertion of 10 lbs, constant sitting and keyboarding, and occasional standing,

3

walking, reaching at desk level, handling and fingering, and frequent travel by car and air. While the medical information reflects claimant's ongoing reports of back pain and left greater than right knee pain, the limited physical exam and diagnostic findings, infrequent provider visits, and the PT functional assessment 10/29/14 do not support that these conditions preclude claimant from performing his physical occupational demands.

(ECF No 11-10 at 46). On December 30, 2014, Dr. Brown wrote to Dr. Wirth and Dr. Liu to advise them of her opinion that Plaintiff did not have any physical or cognitive limitations that precluded him from working and requested their opinions on Plaintiff's functional abilities. On January 8, 2015, Dr. Wirth responded noting that she disagreed with Dr. Brown's assessment. Specifically, Dr. Wirth stated that Plaintiff was "cognitively unable to direct, control, [or] plan activities. He has significant short term memory impairment. He struggles with sustained concentration." (ECF No. 11-10 at 61). She further stated that Plaintiff was told to limit his computer time and perform tasks for certain time limits with frequent breaks. *Id.* Dr. Liu had deferred any opinion on Plaintiff's work capabilities and stated that work capacity testing and neuropsychological testing were necessary to verify his functional capacity. On January 12, 2015, Dr. Brown evaluated the additional information from Dr. Wirth and Dr. Liu and concluded that her opinion was unchanged; however, she did state that it was reasonable to proceed with a functional capacity evaluation ("FCE"). Dr. Brown also determined that an independent medical exam ("IME") should be conducted.

On March 31, 2015, Plaintiff attended his IME. Dr. Snyder conducted the IME and concluded:

> Given his physical complaints there is nothing on his examination or diagnostic studies that support ongoing complaints of pain at the left knee limiting his mobility. There is nothing on his physical examination to suggest any balance problems. He does not have any loss of strength compared to his right side. There is nothing on his examination to suggest any ligamentous instability nor did the MRI support that. He does feel that the Supartz injections he is receiving are helping, so I would complete those as scheduled. Regarding his left knee pain, I

would say he could resume activities as tolerated. No limitations related to the left knee can be supported by his history and physical examination today.

He has a history of chronic low back pain as well. This proceeded the incident of 6/22/14. This does not seem to be an issue at this point. He did not indicate low back pain as a problem today. He has nothing on his examination to suggest any radiculopathy. Imaging studies of his spine were also unremarkable. I see no limitations regarding his physical activities due to any back issues at this time.

I can find no reason that he cannot return to work full duty in regards to his functional capacity with occasional exertion of 10 pounds, constant sitting and keyboarding, occasional standing, walking, reaching at desk level, handling and fingering and frequent car travel by car and air as of 3/31/15. The Neuro Psych testing has yet to be completed.

(ECF No. 11-15 at 52, 53). Defendant approved Plaintiff's claim through the date of the IME and agreed to continue to pay him benefits under a reservation of rights while evaluating his cognitive complaints and eligibility benefits based on his claimed impairments.

Defendant attempted to obtain the results of Plaintiff's neuropsychological testing performed by Dr. Shanna Kurth on April 13, 2015; however, Defendant was unable to attain them. On June 18, 2015, Defendant had a telephone call with Plaintiff where he stated: "Dr. Kurth flip flopped on her decision and his mental functions came back fine except STM [short term memory] was a little lower than average and then she flip flopped and then said it was level of effort during testing." (ECF No. 11-18 at 31).

Plaintiff also saw an orthopedist, Dr. Brad Roberts, for his knee and back pain. Following an MRI of Plaintiff's lumbar spine on April 16, 2015, Plaintiff noted that he was satisfied with the progress regarding his knee, and Dr. Roberts recommended he schedule a follow-up appointment with physiatrist Dr. Amod Sureka for further evaluation of his back. Plaintiff saw Dr. Sureka once. Defendant requested records from both Dr. Roberts and Dr. Sureka as part of its continued medical evaluation. Both doctors refused to fill out any disability forms for Plaintiff. Dr. Roberts stated that Plaintiff's primary-care physician would need to complete the forms.

Defendant consulted again with Dr. Brown who evaluated all the medical records up to July 2015. On July 14, 2015, Dr. Brown submitted a report where she concluded that neither physical nor cognitive functional limitations were supported by the record. She wrote to Dr. Wirth and Plaintiff's chiropractor, Dr. Kevin McCarthy, and advised them of her conclusion and requested they provide their opinions on Plaintiff's functional abilities. On July 28, 2015, Dr. McCarthy provided a letter that stated: "On July 27th I received a request from Arthur Feeney not to send more information to you directly, and to defer my opinion of his condition to Dr. Wirth." (ECF No. 11-20 at 42). With his letter, Dr. McCarthy enclosed a letter from Plaintiff which stated:

> The other physicians treating me and providing diagnostic consultations . . . are deferring to my primary care physician, Dr. Jill K. Wirth, MD, to provide opinions regarding my physical limitations and ability to return to work. Dr. Wirth has been consolidating my information and directing my treatment and diagnostic procedures. I request that you defer opinion regarding my condition and abilities to Dr. Wirth.

*Id.* at 43. On July 31, 2015, Dr. Wirth responded to Dr. Brown and noted that she disagreed with her opinion. Dr. Wirth stated that Plaintiff was

> [u]nable to sit longer than 15 minutes without irritating sciatica causing him to have to stand and walk. Due to the frequency of alternating with sitting and standing there would be difficulty in completion of work in a timely fashion. Headache and fatigue returns with greater than 4 hours of computer time and can be relieved by 1-2 hours napping.

*Id.* at 54. Dr. Wirth further identified the following restrictions: "no sitting for over 15 minutes at time, no lifting greater than 7#, limit computer time to less than 4 hours." *Id.*

On August 18, 2015, Defendant consulted with Dr. Brown for a fourth time, and she prepared an additional written report. Dr. Brown concluded that Plaintiff did not have any cognitive limitations or physical functional limitations after his physical therapy discharge on October 28, 2014. Defendant also consulted with internist Dr. James H. Bress, who evaluated

6

Plaintiff's medical records. On August 19, 2015, Dr. Bress provided a report where he agreed with Dr. Brown that no current cognitive or physical limitations were supported for Plaintiff.

On August 20, 2015, Defendant concluded that Plaintiff was no longer disabled as of April 1, 2015. Subsequently, Defendant ceased paying Plaintiff's disability benefits.

On February 12, 2016, Plaintiff appealed the decision. With his appeal, Plaintiff submitted his April 2015 consultation report from Dr. Kurth that was previously not provided. The report reflected the findings of Plaintiff's two-day neuropsychological evaluation. Dr. Kurth noted that Plaintiff's "results of formal and informal measures of effort suggest presence of sub optimal effort. Accordingly, results reported . . . may not reflect this patient's optimal neuropsychological status at this time." (ECF No. 11-23 at 4). Dr. Kurth further reported:

> The neuropsychological profile is difficult to interpret, as the results of formal and informal measures of effort suggest the potential for non-credible data. Notwithstanding, the results of his cognitive assessment are generally within normal limits, to include high average to above average intellectual skills, normal executive functions, normal language skills, recent memory functions normal for age, and adequate attention/concentration across multiple tasks - none of which are inconsistent with estimates of premorbid ability. Although he was extremely slow to compete a visual search task, the clinical significance of this result is questionable.

*Id.* at 5. Dr. Kurth further opined that although Plaintiff described symptoms that would be consistent with a concussion, "the patient's subjective cognitive difficulties are likely secondary to a combination of the following: highly erratic sleep schedule with excessive sleep hours, headache, physical deconditioning, and Somatic Symptom Disorder (rule out additional diagnosis of depressive condition)." *Id.*

During the appeal process, Defendant also consulted with a certified rehabilitation counselor, Richard Byard. On March 11, 2016, Mr. Byard provided a report that stated Plaintiff's occupation "would typically call for the occasional lifting/exertion of force of up to the 20 lb.

level." (ECF No. 11-26 at 210). Based on the additional vocational assessment that found a change in the physical exertion required from ten pounds to twenty pounds, Defendant sent follow up questions to Dr. Snyder, the IME examiner.

Additionally, Defendant consulted with a board-certified family practitioner, Dr. Chris Bartlett, a neuropsychologist, Dr. F. William Black, and a psychiatrist, Dr. Peter Brown. Dr. Bartlett evaluated the medical evidence and prepared a report on March 22, 2016, and addendum on May 26, 2016, that concluded Plaintiff did not have physical or cognitive limitations that would prevent him from performing his regular occupation. In his report, Dr. Bartlett opined that Dr. Wirth's limitations for Plaintiff, including sitting for fifteen minutes, no lifting greater than seven pounds, and limiting computer time to less than four hours was "overly restrictive based upon his exams/imaging, his ability to sit comfortably during the IME, the opinion of the IME provider, his demonstrated functional capacity to drive, lift [?] his neighbor, and do outdoor chores and his reported 6-7 hours per day of current screen time." *Id.* at 236-237. On March 28, 2016, Dr. Black provided a report where he opined that Plaintiff was not cognitively impaired and that Dr. Kurth's neuropsychological evaluation did not provide any evidence that Plaintiff had any cognitive impairments. On April 11, 2016, and April 12, 2016, Dr. Brown provided a report where he stated that functional restrictions and limitations for Plaintiff were not supported by the record and did not support an ongoing loss of functional capacity.

On April 13, 2016, Defendant contacted the IME examiner, Dr. Snyder, asking if her opinion had changed based on the vocational analysis, which found that Plaintiff's occupation could entail a physical exertion of twenty pounds, as opposed to the original ten pounds. On April 18, 2016, Dr. Snyder replied stating that since Plaintiff's IME had been conducted over a year ago, she could not recall Plaintiff, or indicate whether she still agreed with the statements.

She further stated that she no longer conducted IMEs and suggested Defendant find a different practitioner if it had further questions regarding Plaintiff's status. After receiving this letter, Defendant decided to proceed with a paper IME because "a physical IME cannot help determine functional capacity as of the date benefits were paid through 8/20/15." *Id.* at 274. "Because the occ[upational] lifting demands have changed on appeal . . . a paper IME will help determine lifting functionality as of 8/21/15." *Id.* at 276. Defendant advised Plaintiff's counsel at the time of the paper IME and requested an extension to which counsel agreed.

For the paper IME, Defendant consulted with Dr. Michael S. Slobasky, who is board certified in physical medicine and rehabilitation with a sub-specialty in pain medicine, and expertise in interventional pain medicine and electrodiagnostics. On May 17, 2016, Dr. Slobasky provided a report that concluded Plaintiff did not have physical limitations that precluded him from working. On May 27, 2016, Defendant upheld its benefit termination and denied Plaintiff's appeal request.

## II. The Plan

The pertinent portions of Defendant's beneficiary plan ("The Plan") include the following:

How Does Unum Define Disability?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

You must be under the regular care of a physician in order to be considered disabled.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

(ECF No. 11-3 at 17). The Plan defines "material and substantial" duties as:

9

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

*Id.* at 32. The Plan defines "regular occupation" as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.* at 34. The Plan explains that Defendant will stop sending payments and the claim will end when the following occurs:

- when you are able to work in your regular occupation on a part-time basis and you do not;
- if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to submit proof of continuing disability;
- after 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits;
- the date you die.

*Id.* at 23. Furthermore, the Plan states that "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." *Id.* at 13.

Plaintiff argues that Defendant's termination of benefits was arbitrary and capricious, because there was no evidence that his functional capacity improved after the IME and Defendant failed to follow its consultant's recommendation to obtain an updated IME following Plaintiff's

10

appeal. Defendant argues that it reasonably determined Plaintiff failed to qualify for benefits and its denial has rational support in the administrative record.

Plaintiff seeks benefits under an employee welfare benefit plan governed by ERISA. He requests that the Court reverse Defendant's termination decision and order Defendant to pay all past-due benefits with interest, as well as attorney's fees. This Opinion follows.

## STANDARD OF REVIEW

### I. Summary Judgment Standard

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). The moving party may meet its burden by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 322. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Rule 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322. The court must then determine whether there is a need for trial, in other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 477 U.S. 242 at 249.

## II. ERISA Standard

Under ERISA's civil enforcement provision, § 1132(a)(1)(B), the judicial standard of review hinges on whether the language of the policy grants the plan administrator or fiduciary discretionary authority in making benefit determinations or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan grants the administrator or fiduciary discretionary authority to determine eligibility for benefits, a deferential standard of review is appropriate. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *see also Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 605–06 (7th Cir. 2008). Under the deferential standard, which is applicable when the plan affords the plan administrator broad discretion to interpret the plan and determine benefit eligibility, "judicial review of the administrator's decision to deny benefits is limited to the arbitrary-and-capricious standard." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007).

In this case, the Parties agree that the benefit plan confers discretionary authority on the administrator. Accordingly, this Court's review incorporates an arbitrary and capricious standard. Under the arbitrary and capricious standard, a court "will overturn a plan administrator's decision only ... if it is downright unreasonable." *Mote*, 502 F.3d at 606 (internal quotation marks and citation omitted). That is, "th[e] court will not substitute the conclusion it would have reached for the decision of the administrator, as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Herman v. Cent. States, Se. and Sw. Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005) (internal quotation marks and citation omitted). Furthermore, a court's review under the arbitrary and capricious standard is limited to the evidence in the administrative record. *Hess v. Reg–Ellen Mach. Tool Corp.*, 423 F.3d 653, 662 (7th Cir. 2005).

**ANALYSIS**

Plaintiff argues that Defendant's decision to discontinue his benefits was arbitrary and capricious. According to Plaintiff, Defendant conceded initial liability to pay Plaintiff's claim based upon the restrictions and limitations provided by Dr. Snyder, the IME doctor; however, after non-examining file reviews were conducted, Defendant discontinued Plaintiff's benefits and concluded that as of April 1, 2015, Plaintiff was no longer disabled. Plaintiff contends that because there is no evidence of any improvement in his physical condition between the March 31, 2015 IME and April 1, 2015, and because Defendant allegedly rejected the IME doctor's recommendation to send him for another IME, Defendant's decision was unreasonable. Defendant argues that the totality of medical evidence provides a rational basis for its determination to stop paying Plaintiff's benefits and close his claim. Defendant claims the supporting evidence includes Plaintiff's physical therapy discharge report, the IME, Dr. Kurth's neurophysiological evaluation and testing, objective CT and MRI findings, and the opinions of five physicians and a clinical psychologist consulted by Defendant.

**I.     Evidence of Plaintiff's Improvements**

The Court finds that Plaintiff's arguments regarding his lack of improvements are a misreading of the administrative record. The IME report shows that Dr. Snyder concluded that Plaintiff could go back to work, not that he was disabled. Dr. Snyder specifically stated, "I can find no reason that he cannot return to work full duty in regards to his functional capacity …" (ECF No. 11-15 at 53). Dr. Snyder did not provide an evaluation regarding Plaintiff's cognitive limitations. As a result, Defendant agreed to continue to pay him benefits under a reservation of rights while evaluating his cognitive complaints and eligibility benefits based on his claimed impairments. According to the record, Plaintiff was approved for benefits *through the date* of the

IME because he was unable to perform the duties of his occupation between the date of the incident and the date of the IME. (ECF No. 11-16 at 30). However, Plaintiff's impairment was "unclear" past the IME date, and therefore, Defendant agreed to continue to pay benefits until it received additional outstanding medical records from Plaintiff's doctors. *Id.* at 30, 31. Nothing in the administrative record indicates that Defendant agreed to pay Plaintiff's benefits based upon restrictions and limitations provided by Dr. Snyder. In fact, she opined:

> [T]here is nothing on his examination or diagnostic studies that support ongoing complaints of pain at the left knee limiting his mobility . . . nothing on his physical examination to suggest any balance problems . . . nothing on his examination to suggest any ligamentous instability nor did his MRI support that . . . no limitations related to the left knee . . . no limitations regarding his physical activities due to any back issues.

(ECF No. 11-15 at 52). Defendant asked Dr. Snyder if Plaintiff had the functional capacity to perform his physical occupational demands, specifically "occasional exertion of 10 pounds, constant sitting and keyboarding, and occasional standing, walking, reaching at desk level, handling and fingering and frequent travel by car and air." *Id.* Dr. Snyder responded that he could. Plaintiff misconstrues the facts by alleging that Dr. Snyder provided these restrictions, but they were not placed by Dr. Snyder, rather, they were specific limitations provided by Defendant that reflected the physical requirements of Plaintiff's job as concluded by a September 26, 2014 vocational assessment. (ECF No. 11-4 at 22).

Plaintiff contends that his functional capacity did not improve the day after the IME, which occurred on March 31, 2015. However, a review of the record shows that Plaintiff's condition improved a few months before the IME. On October 29, 2014, the discharge report from Plaintiff's physical therapist indicated that he had made several improvements in functional capabilities. The report concluded that Plaintiff "made good progress over the course of treatment," which lasted from July 2014 to October 2014. (ECF No. 11-8 at 60). Plaintiff went from being unable to walk

14

without symptoms, unable to sit or stand for fifteen minutes, unable to transfer from sitting to standing without assistance, unable to lift five pounds, and having reduced lumbar range of motion to having no pain at rest, sitting with no symptoms, standing for sixty minutes at a time, no difficulty transferring from sitting to standing, able to walk 501 to 1001 yards without symptoms, able to lift in excess of twenty-five pounds with no difficulty, normal range of motion in his lumber spine with no impairment, full 5/5 strength in his knees, ankles, and hip flexion and abductors, with only mild weakness in his hip extensors at 4/5. *Id.* at 58-60. While he was still reporting pain at levels between 6-10, most of the report was positive. Following this report, on December 15, 2014, Defendant obtained the opinion of a nurse who also concluded that Plaintiff had the functional capacity to perform the physical requirements of his employment. (ECF No 11-10 at 46).

After the IME report, Defendant continued to evaluate Plaintiff's claim to determine his cognitive deficits. An April 2015 report from Dr. Kurth confirmed that Plaintiff did not have any cognitive defects, instead, he concluded that Plaintiff was suffering from secondary issues such as erratic sleep and Somatic Symptom Disorder. (ECF No. 11-23 at 4). Notwithstanding these facts, Plaintiff does not contest Defendant's decision regarding his cognitive impairment, nor does he present any arguments about the impairment. Plaintiff's motion for summary judgment focuses only on his functional capabilities. Therefore, he has waived any argument related to cognitive defects. *See Wright v. United States*, 139 F3d 551, 553 (7th Cir. 1998).

The Court also finds Plaintiff's disagreement with Defendant's use of its own consulting physicians unpersuasive. Defendant consulted with five physicians, each of whom concluded that Plaintiff had the functional capacity to perform his occupation. (ECF Nos. 11-10 at 46; 11-20 at 9; 11-21 at 33-37 and 39-41; 11-26 at 236-237 and 251-256; 11-31 at 26-28). Courts have repeatedly

15

held that consulting physicians are an acceptable procedure for insurance companies to use when reviewing a claimant's medical files. *See Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan,* 687 F.3d 320, 335 (7th Cir. 2012). Here, the five physicians conducted a paper review, and the Seventh Circuit has explicitly ruled that nothing prohibits this sort of practice. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569 (7th Cir. 2006). Specifically, the Seventh Circuit concluded:

> [O]ur research has not disclosed, any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Id.* at 577.

Additionally, Plaintiff underwent scans after March 31, 2015. On April 24, 2015, Plaintiff saw physiatrist Dr. Sureka who noted that "an MRI of the lumbar spine did not demonstrate significant central or foraminal stenosis." (ECF No. 11-17 at 2). On April 30, 2015, the impression from Plaintiff's three-phase bone scintigraphy demonstrated that there was "degenerative activity at T9 to T12 and LW levels corresponding to hypertrophic spurring. No acute findings." *Id.* at 69. On July 24, 2015, Plaintiff had an MRI of his thoracic spine and the impression revealed that there was "no canal stenosis or neuroforaminal stenosis," "old compression deformity in T12. Degenerative changes in the costovertebral joints at almost all the levels," and "degenerative changes in the costovertebral joints at multiple levels." (ECF No. 11-24 at 93). There was no disc herniation and normal cord signal. *Id.*

All five physicians with whom Defendant consulted analyzed Plaintiff's medical record and came to the same conclusion in their reports: Plaintiff did not have work-precluding functional

limitations. (ECF Nos. 11-10 at 46; 11-20 at 9; 11-21 at 33-37 and 39-41; 11-26 at 236-237 and 251-256; 11-31 at 26-28). Plaintiff contends that Defendant ignored his treating physician's findings, but the record suggests otherwise. Defendant actively sought the opinion of Plaintiff's treating physicians. (ECF No. 11-4 at 25-28; 11-5 at 40-43; 11-10 at 51-53; 11-11 at 6; 11-15 at 33, 84-85; 11-18 at 19, 21-22; 11-16 at 9-11, 75; 11-20 at 12-14, 24-26). Dr. Wirth was the only physician that Plaintiff allowed Defendant to receive responses from. Even after being presented with objective test findings and Defendant's consulting physicians' opinions, Dr. Wirth remained the only physician that continued to opine that Plaintiff was unable to return to work. While courts have held that it is arbitrary and capricious for an administrator to ignore a treating physician's medical conclusions *without explanation*, that did not occur here. *See Majeski v. Metro. Life Ins. Co.,* 590 F.3d 478, 484 (7th Cir. 2009) (emphasis added). Additionally, Defendant is not required to give greater weight to Dr. Wirth's opinions. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."). Defendant did not dismiss Plaintiff's physicians' conclusions without explanation. On August 20, 2015, Defendant provided Plaintiff with an eight-page letter outlining its reasons for denying Plaintiff continued benefits. (ECF No. 11-22 at 2-9). Among several items, Defendant's reasoning included the results of Plaintiff's IME, medical records from treating physicians, objective findings from CT scans and MRIs, and the opinions of the physicians Defendant consulted with. *Id.* Furthermore, on May 27, 2016, Defendant provided a thirteen-page letter that outlined its reasoning to uphold its decision to close Plaintiff's claim. (ECF No. 11-32 at 36-48). The letter was organized into sections, such as cognitive health conditions, concussion, headaches, back pain, knee pain, and more, with each

section including a summary of what Defendant reviewed and why it reached the decision it did to end Plaintiff's benefits. *Id.*

Recognizing the foregoing, the Court finds that it was far from illogical to determine that Plaintiff could return to work. Therefore, the Court concludes that Defendant's decision to discontinue Plaintiff's benefits was not downright unreasonable.

## II. IME Doctor's Recommendation

Plaintiff contends that as part of the appeal process, Defendant wrote to Dr. Snyder, the physician who performed Plaintiff's IME, and requested that she re-write her opinion in order to allow it to deny Plaintiff's appeal. According to Plaintiff, Dr. Snyder refused and told Defendant to find a different practitioner to conduct Plaintiff's IME. This is another mischaracterization of the record. Defendant contacted Dr. Snyder after Plaintiff's vocational assessment increased from a physical exertion of ten pounds to twenty pounds. Defendant inquired whether Dr. Snyder's opinion had changed in light of the new analysis. This inquiry appears to be proper due diligence on Defendant's part. There is nothing in the record that suggests Defendant contacted Dr. Snyder to change her opinion so that they would be able to deny his appeal. Unfortunately, Dr. Snyder could not provide an updated opinion because Plaintiff's IME was conducted over a year ago and she no longer did IMEs. As a result, Dr. Snyder stated that if Defendant still had questions about Plaintiff's status, it would need to contact a different practitioner to conduct the IME. Nothing in her letter suggests to the Court that she was recommending Plaintiff for another IME. Instead, she simply asserted that if Defendant continued to have questions about Plaintiff, it would need to consult a different physician because she no longer performed IMEs. Thereafter, Defendant used its discretionary authority and decided to conduct a paper IME instead of a physical one. The Court finds this was acceptable. *See Davis*, 444 F.3d at 577.

18

Based upon the administrative record, the Court finds that Defendant's determination should be upheld under the arbitrary and capricious standard because: "(1) it is possible to offer a reasoned explanation, based on the evidence" for Defendant's decision to discontinue benefits and to deny Plaintiff's appeal; "(2) the decision is based on a reasonable explanation of relevant plan documents;" and "(3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321-22 (7th Cir. 2007).

## CONCLUSION

For the reasons stated above, Plaintiff's [19] Motion for Summary Judgment is DENIED, and Defendant's [20] Motion for Judgment on the Pleadings is GRANTED. Furthermore, the motion hearing set for Wednesday, May 13, 2020, at 4:00PM has been CANCELLED. The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff. This case is now TERMINATED.

ENTERED this 25th day of March, 2020.

                                                               /s/ Michael M. Mihm
                                                                    Michael M. Mihm
                                                              United States District Judge